# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Sirius XM Radio Inc. | Index No. _____ |
| Plaintiff, | |
| | **SUMMONS** |
| v. | |
| | The basis of venue is CPLR § 503 |
| Adeptus Partners, LLC; Lewis Stark, | |
| Defendants. | |

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer, or if the Complaint was not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

The basis of venue is CPLR § 503, which is where Defendants reside and regularly transact, engage in, and solicit business. This litigation also stems from Defendants' infliction of harm on Sirius XM, a New York resident.

Dated: August 12, 2024

New York, New York

WEIL, GOTSHAL & MANGES LLP

By: /s/ Todd Larson
_____
Todd Larson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8238
Facsimile: (212) 310-8007
Todd.Larson@weil.com

Andrew S. Tulumello*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
Drew.Tulumello@weil.com

*Pro hac vice motion forthcoming

Counsel for Sirius XM Radio Inc.

TO: Lewis Stark
167 Pebble Lane
Hewlett, New York 11557

Lewis Stark
Adeptus Partners LLC
244 West 54th Street, 9th Floor
New York, New York 10019

Adeptus Partners LLC
244 West 54th Street, 9th Floor
New York, New York 10019

Secretary of State of New York
(as Registered Agent for
Adeptus Partners LLC)
One Commerce Plaza
99 Washington Avenue
Albany, New York 12231

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| Sirius XM Radio Inc. | Index No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Adeptus Partners, LLC; Lewis Stark, | |
| Defendants. | |

## INTRODUCTION

This is a case about an audit firm and one of its partners that befouled the standards of their profession.  Defendants Adeptus Partners, LLC ("Adeptus") and Lewis Stark ("Stark") openly violated the bedrock norm of auditor independence through the course of a years-long purported audit of Plaintiff Sirius XM Radio Inc. ("Sirius XM").  They signed a contract pledging to be bound by the accounting profession's standards of "independence," but instead acted as partisans and advocates determined to find fault with the way Sirius XM calculates royalty payments under a statutory and regulatory framework established by Congress and the Copyright Royalty Board.  Only in the aftermath of their intrusive and prejudicial "royalty inspection" did Adeptus and Stark admit they were not "independent" and did not perform an "audit" as they had contractually represented.  Their false statements and misconduct caused significant financial harm to Sirius XM, for which this lawsuit seeks a just and speedy remedy.

## NATURE OF THE ACTION

1.     Public accounting firms and the partners who run them have an ethical and, in this case, contractual obligation to remain independent—in both fact and appearance—when conducting audits.  This action stems from Defendants' failure to comply with these important requirements.

2.      Adeptus and Stark agreed, by contract, to complete an independent audit of Sirius XM's 2018 royalty payments to non-party SoundExchange.  To gain access to Sirius XM's highly-sensitive financial information, Adeptus and Stark assured Sirius XM in writing that they would act in full accordance with the independence standards set forth in the Code of Professional Conduct for the American Institute of Certified Public Accountants ("AICPA").  But the independent audit they promised turned into a one-sided "inspection of . . . royalty statements," delivered as a "consulting service" for SoundExchange, their client.

3.      Sirius XM did not know—and Adeptus and Stark actively concealed—that they had abandoned their independent judgment in service of SoundExchange's interests.  In turn, Adeptus and Stark probed and prodded Sirius XM, propounding inappropriate, harassing, and duplicative data requests rooted in contrived legal interpretations of Copyright Act regulations. They did so to manufacture support for alleged royalty underpayments that SoundExchange could use to demand payments from Sirius XM.

4.      Sirius XM never expected Defendants' "audit" to be a sham, much less a "consulting" hit job for SoundExchange's benefit.  Nor could Sirius XM foretell that the "audit" would be drawn out *for years*, with Stark disappearing for months at a time.  But by the time all this became apparent to Sirius XM, it was too late.  The company had already expended its valuable time and resources submitting to Defendants' so-called "royalty inspection," which—in the end—Defendants *admitted* was not an independent audit under the standards set forth in the AICPA Code, as required by the Parties' agreement.  And soon, Sirius XM would incur hundreds of thousands of dollars in attorney's fees defending itself in federal court against unfounded allegations made by SoundExchange in response to Defendants' biased "royalty inspection" report.

2

5.      This suit seeks to recover these fees and to compensate Sirius XM for the damages it suffered due to Defendants' failure to adhere to their contractual commitments and professional standards.  Adeptus and Stark acted with deceit and a lack of independence, causing significant financial harm for which they must now account.

## THE PARTIES

6.      Plaintiff Sirius XM Radio Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in New York, located at 1221 Avenue of the Americas, 35th Floor, New York, NY 10020.  Sirius XM delivers satellite digital audio radio and webcasting services to approximately 34 million subscribers nationwide.

7.      On information and belief, Defendant Adeptus Partners LLC is a limited liability company organized and existing under the laws of New Jersey with its principal place of business located at 244 West 54th Street, 9th Floor, New York, NY 10019.  Adeptus is registered as a Public Accountancy firm in the State of New York and is generally engaged in the practice of certified public accounting and related services.  At all relevant times Adeptus was authorized to do business in the state of New York.

8.      On information and belief, Defendant Lewis Stark is a resident of New York.  Stark is registered as a Certified Public Accountant in the State of New York.  He currently works as a partner at Adeptus, based in New York City, and has maintained a longstanding business relationship with SoundExchange.  Over the last ten years, SoundExchange has hired Stark three times to perform examinations of Sirius XM's royalty payments to SoundExchange.  Each time, Stark performed the work with a separate audit firm.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302.  They reside in New York and regularly transact, engage in, and solicit business in the state. This litigation also stems from Defendants' infliction of harm on Sirius XM, a New York resident, through their inspection of Sirius XM's records at Sirius XM's headquarters in New York.

10.     For the same reasons, venue is proper in New York County under N.Y. C.P.L.R. § 503.

11.     The amount in controversy exceeds the Commercial Division's $500,000 jurisdictional threshold (exclusive of punitive damages, interest, costs, disbursements, and counsel fees).

12.     As set forth in more detail below, the causes of action being asserted are: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) negligence.

## FACTUAL BACKGROUND

**A.     The Copyright Act requires auditor independence as defined by the AICPA Code of Professional Conduct**

13.     Section 106 of the Copyright Act, 17 U.S.C. § 106(6), grants record companies and recording artists the right to be compensated under U.S. copyright law for public performances of their copyrighted sound recordings performed by means of a digital audio transmission.  In order to simplify the licensing process in relation to the digital performance right, the Act also provides for a licensing mechanism that enables companies like Sirius XM to obtain a "statutory license" to transmit sound recordings over a digital audio service without negotiating individually with each separate sound recording owner and artist.  *See id*. §§ 112(e); 114(d).

14.     Under this statutory licensing scheme, a specialized regulatory agency—the Copyright Royalty Board (the "CRB")—sets royalty rates for all statutory license users.  *See id*.

4

§ 114(f)(1)(A).  The CRB has designated non-party SoundExchange to receive and distribute royalty payments to the appropriate artists and record companies.

15.      Under CRB regulations, SoundExchange is permitted to review the payments made by statutory license users via an *independent* audit of users' annual royalty payments.  37 C.F.R. § 382.7(a)–(d).  It exercises this right by hiring an *independent* auditor to examine a licensee's payments and distributions.  *See id.*

16.      The hired auditor must be a "Qualified Auditor," which CRB regulations define as a "Certified Public Accountant independent within the meaning of the [AICPA] Code of Professional Conduct."  *Id.* § 382.1.

17.      Importantly, the "Qualified Auditor" hired by SoundExchange must be independent of both SoundExchange and the subject of the audit, here Sirius XM.  *See* 72 Fed. Reg. 24084, 24109 (May 1, 2007) ("While technical audits by in-house personnel might be cheaper for [SoundExchange], we conclude that it is more important, in the interest of establishing a high level of credibility in the results of the audit, that the auditor be independent of both parties. . . .  In sum, the Copyright Royalty Judges are requiring that the auditor be certified and independent of both SoundExchange and the Services being audited.")[1]; 81 Fed. Reg. 26315, 26403 (May 2, 2016) (rejecting SoundExchange's proposal to allow non-CPAs to perform audits because "CPAs inspire confidence in the audit results because of the standards of their profession" and reaffirming the CRB's rejection of SoundExchange's proposal to allow non-independent, internal auditors to perform audits under the regulatory scheme).

---

[1] *See* 72 Fed. Reg. 24084, 24084 (May 1, 2007) ("The Services are Internet webcasters or broadcast radio simulcasters that each employ a technology known as streaming, but comprise a range of different business models and music programming.").

5

18.     The AICPA Code of Professional Conduct, in turn, requires unimpaired independence for all attest services, including audits. *See* AICPA, Code of Professional Conduct, §§ 1.200.001.01; 0.400.01. Unimpaired independence demands "independence of mind" and "independence in appearance." *Id.* § 0.400.23.

19.     The AICPA Code defines "independence of mind" as a mental state unaffected "by influences that compromise professional judgment." *Id.* § 0.400.23. "[I]ndependence of mind" enables a member [e.g., Adeptus] "to act with integrity and exercise objectivity and professional skepticism." *Id.*

20.     Similarly, the AICPA Code defines "independence in appearance" as "the avoidance of circumstances that would cause a reasonable and informed third party who has knowledge of all relevant information" to conclude that the "integrity, objectivity, or professional skepticism" of an auditor has been compromised. *Id.*

21.     The AICPA Code cautions that "[i]ndependence precludes relationships that may appear to impair . . . objectivity," and that "objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest." *Id.* § 0.300.050; *see also id.* § 1.100.001.01 (observing that a member [e.g., Adeptus] "shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.").

22.     Even under AICPA's standards for the provision of "consulting services"—as opposed to attestation services—Adeptus likewise had a freestanding obligation to maintain objectivity: "to be impartial, intellectually honest, and free of conflicts of interest." AICPA, *Statement on Standards for Consulting Services*, § 100.07 & n.2.

**B.**   **CRB regulations require "Qualified Auditors" to perform specific tasks when auditing license user "Payors" like Sirius XM**

23.     Under CRB regulations, Qualified Auditors must "determine the accuracy of royalty payments or distributions [made by a Payor], including whether the Payor made an underpayment *or overpayment* of royalties." 37 C.F.R. § 382.7(d) (emphasis added).

24.     The Qualified Auditor also has a duty to consult with the Payor:  It must "review [its] tentative written findings of the audit with the appropriate agent or employee of the Payor in order to remedy any factual errors and clarify any issues relating to the audit . . . ." *Id*. § 382.7(f). After doing so, it must provide a written report to the payee—here, SoundExchange.  *See id*.

**C.**   **SoundExchange hires Defendants as its "Qualified Auditor" to review Sirius XM's 2018 royalty payments under the Copyright Act**

25.     Under the powers and limitations set forth under the statutory and regulatory scheme detailed above, in mid-2019, SoundExchange retained Stark, then a partner at Prager Metis CPAs, LLC ("Prager Metis"), to audit Sirius XM's 2018 royalty payments.

26.     Before starting work on the audit, Stark signed a Nondisclosure Agreement with Sirius XM in which he promised to perform "an *independent* audit of the payments and distributions of Sirius XM" within the meaning of the AICPA Code in order to gain access to Sirius XM's sensitive financial data.  *See* Ex. A (2020 NDA) at 1 (emphasis added); *see also id.* ¶¶ 6–7 (agreeing that the audit will adhere to 37 C.F.R. § 382.7 and that at all times during the performance of the audit, Prager Metis will remain a "Qualified Auditor" within the meaning of 37 CFR § 382.1).

27.     Stark's promise was illusory.  Prager Metis and its partners had been violating auditor independence rules for years, inserting terms in client engagement letters that, according to the Securities and Exchange Commission, allowed the firm to "depart[] from the standards of

7

objectivity and impartiality" without assuming any financial risk. *See* Complaint, *SEC v. Prager Metis CPAs, LLC*, No. 1:23-cv-23723 (S.D. Fla. Sept. 29, 2023), ECF No. 1 ¶ 28.

28.     Soon after being retained by SoundExchange to perform the "audit" of Sirius XM's 2018 royalty payments, Stark left Prager Metis to join Adeptus. Despite the change in scenery, Stark continued to depart from professional standards of objectivity and impartiality. To this day, his Adeptus webpage boasts of "recover[ing] hundreds of millions of dollars for his clients" including "licensors, licensees, as well as other IP owners and agents." *Meet Lewis Stark*, ADEPTUS PARTNERS, LLC (last visited Aug. 1, 2024), at bit.ly/3wG1ecW. And he continues to tout his prior work at Prager Metis as "an essential component to maximize royalties" for his clients. *Lewis Stark, CPA, CFE*, LINKEDIN, (last visited Aug. 1, 2024, at bit.ly/4c3p42o. These words are those of a self-marketing *advocate* that lacks objectivity—not an independent auditor.

29.     Stark never bothered to tell Sirius XM that he had left Prager Metis—despite being midway through his inspection of Sirius XM's financial records. It wasn't until Sirius XM's messages to Stark's Prager Metis email address started bouncing back that the company began questioning Stark's whereabouts.

30.     When Stark finally resurfaced, he immediately reasserted control over the "audit" with full support from SoundExchange. Defendants then required Sirius XM to retransmit all data and messages the company had previously sent to Prager Metis. This burdensome and duplicative process prolonged Defendants' "royalty inspection" at great financial cost to Sirius XM.

31.     Thereafter, on November 23, 2021, the Parties entered an updated Nondisclosure Agreement ("the Contract"), attached hereto as Exhibit B.[2]

---

[2] The 2021 NDA with Adeptus is identical in all material respects to the 2020 NDA Sirius XM signed with Defendant Stark before he left Prager Metis to join Adeptus.

32.     As with the prior Nondisclosure Agreement, Adeptus and Stark bargained for access to Sirius XM's sensitive financial information by promising to maintain full AICPA independence through the course of their audit.  *See id.* ¶¶ 2–7.

33.     The Contract recognized that Defendants' AICPA independence was a *sine qua non* of their authority to act as a "Qualified Auditor" under CRB regulations.  *See id.* ¶¶ 6–7 (citing 37 C.F.R. §§ 382.1, 382.7).  Absent AICPA independence, there could be no legitimate CRB audit.

**D.     Adeptus's "inspection" of Sirius XM's 2018 royalty payments violates its express contractual representations**

34.     Adeptus and Stark did not live up to their assurances of independence under the AICPA Code and never had any intent of doing so.

35.     Upon information and belief, SoundExchange engaged Stark at Prager Metis, and later at Adeptus, to perform the regulatory audit as a "consulting service."  Because the AICPA standards for consulting services do not require "independence," AICPA, *Statement on Standards for Consulting Services*, § 100.09 & n.4, neither Stark nor Adeptus could ever satisfy their respective obligations under the Contract to remain a "Qualified Auditor" within the meaning of 37 C.F.R. § 382.1—*i.e.*, a Certified Public Accountant independent of both SoundExchange and Sirius XM.

36.     Instead, Stark and Adeptus engaged in probing and dilatory investigation tactics designed to manufacture support for preconceived legal arguments alleging royalty underpayments owed to their co-dependent consulting client, SoundExchange.  Defendants knew from their own expertise that the governing regulation's reference to "generally accepted auditing standards" ("GAAS"), 37 C.F.R. § 382.7(d), only allowed them "to express an opinion on whether the amounts presented on the royalty statements" furnished by Sirius XM were "reasonably accurate," Lewis Stark, *Key Financial Building Blocks of Licensing Agreements to Maximize Revenue and*

9

*Protect Intellectual Properties*, BUILDING BLOCKS OF LICENSING AGREEMENTS 8 (Mar. 2019), at bit.ly/49E47JN. Yet, Defendants acted as if the applicable Copyright Act regulations authorized them to render *legal* judgments on Sirius XM's compliance with CRB regulations and to toss GAAS aside in lieu of whatever "accounting standards and procedures" they preferred. *See id.*

37. In aid of this fishing expedition, Defendants' requests to Sirius XM in the course of their "audit" were egregiously resource-intensive, prompting Sirius XM employees to object to the lost hours they spent parsing Defendants' overbearing inquiries. Among other things, Defendants:

- Required custom coding and data preparation that took dozens of hours of time to prepare;
- Demanded that Sirius XM create data visualizations that might unearth an error;
- Called for increasingly granular "gap" performance data while refusing to accept Sirius XM's playlist logs as proffered; and
- Conducted a detailed review and purported legal analysis of the terms and conditions of Sirius XM's direct licenses and artist waivers, under which Sirius XM obtains performance rights directly from record companies and artists (rather than via the statutory licenses).

38. Defendants' approach was nothing more than a thinly-veiled effort to find a basis—however untenable—to claim royalty underpayments in order to benefit SoundExchange. By way of example, Defendants opined on issues of contract interpretation—pure legal issues—that were well beyond any professional expertise they possessed in order to substantiate findings of potential underpayments. And rather than confirm that Sirius XM had properly accounted for performances under its direct licenses and artist royalty waivers, Defendants instead reviewed and second-guessed the underlying terms of those agreements to contend that they were legally insufficient to convey the rights Sirius XM claimed. In effect, Defendants sought to nullify Sirius XM's direct licenses and force the company to pay SoundExchange separately and additionally for performances that Sirius XM had already licensed directly from copyright owners.

39.     On information and belief, this improper conduct was prompted by SoundExchange, which has funded Stark and his firms for years in an attempt to frustrate Sirius XM's ability to exclude appropriate amounts from its Gross Revenue calculations as well as its right to engage in direct licensing.  *See, e.g.*, Complaint, *Sirius XM Radio Inc. v. SoundExchange Inc.,* 1:12-cv-02259 (S.D.N.Y. Mar. 27, 2012), ECF No. 1 at 1–6 (detailing SoundExchange's coordinated efforts to block direct licensing).

**E.     Adeptus concedes that it failed to perform an audit, as required by its contractual representations**

40.     On July 12, 2022, Defendants issued their findings in a draft report, alleging that Sirius XM had underpaid royalties for the 2018 calendar year in various respects by approximately $10.3 million.

41.     Counter to their explicit, contractual commitment to adhere to governing CRB regulations, Defendants did not identify a single *over*payment to SoundExchange in any amount— an unsurprising outcome given their examination's exclusive focus on potential *underpayments*. *Contra* 37 C.F.R. § 382.7(d).

42.     Remarkably, Defendants also prefaced their findings with an admission that the procedures they employed for their "royalty inspection" was a "consulting service conducted under the [AICPA] consulting standards."  Again, those AICPA standards do *not* require independence, even though both the Contract and the applicable regulatory framework require Defendants' independence from both SoundExchange and Sirius XM.  Further, Defendants stated that the procedures they employed did *not* "constitute an audit or an examination under attestation standards established by the AICPA"—which, on the other hand, *do* require Adeptus' independence.  In doing so, Defendants conceded the breach of their express contractual promise

to Sirius XM to perform an independent audit as a "Qualified Auditor" in compliance with the standards set forth in the CRB regulations.

**F.      Adeptus refuses to engage with Sirius XM to correct known errors in its report, driving additional costs (and further evidencing Adeptus's lack of independence)**

43.      Sirius XM responded in writing to Defendants' findings in a letter dated August 5, 2022.  Therein, Sirius XM raised serious concerns with Defendants' audit process, as detailed above.   Specifically, Sirius XM identified a large number of accounting and *legal* errors contributing to Defendants' false identification of royalty underpayments.  Defendants refused to correct these errors.

44.      In good faith, Sirius XM's letter also acknowledged a few limited calculation errors Sirius XM *had* made (comprising roughly 3% of the alleged total underpayment).  But with regard to the remaining miscalculations, Sirius XM reserved its rights to pursue all available legal remedies against Defendants.

45.      Defendants sent their final report to SoundExchange on September 6, 2023. Although Defendant Stark initially offered to append Sirius XM's letter to that report (in accordance with his historical practice), he did not keep his word.

46.      Upon receipt of Defendants' final report, SoundExchange demanded that Sirius XM pay it $10.3 million in underpayments for the 2018 calendar year.  When Sirius XM balked for the reasons outlined above, SoundExchange initiated litigation premised in substantial part on Defendants' royalty inspection.  *See* Complaint, *SoundExchange Inc., v. Sirius XM Radio Inc.*, 1:23-cv-01083 (E.D. Va. Aug. 16, 2023), ECF No. 1 at 20–24.  That matter remains pending.

## COUNT I: BREACH OF CONTRACT

47.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

48.     Defendants entered into a binding, valid, and enforceable Contract with Sirius XM in which they represented that they would act as a Qualified Auditor under CRB regulations.

49.     Specifically, Provisions 6 and 7 of the Contract represented that Defendants would perform an independent audit, as contemplated by 37 C.F.R. § 382.7, and that they would "at all times during [its] performance" remain a Qualified Auditor within the meaning of 37 C.F.R. § 382.1—a provision requiring full independence under the AICPA Code of Professional Conduct and long-settled CRB rulemaking.

50.     By conducting the independent audit as a consulting service and abdicating their contractual and regulatory independence requirements, Defendants breached the Contract.  They conducted an unsanctioned "royalty inspection" that was subject to SoundExchange's outside influence, in direct violation of the Contract, CRB regulations, and the AICPA's standards for auditor independence.  In the end, they openly admitted that their "royalty inspection" did "not constitute an audit or an examination under attestation standards established by the AICPA."

51.     Defendants also breached their duty to consult under Section 382.7.  Rather than reviewing its tentative findings with Sirius XM "to remedy any factual errors and clarify any issues relating to the audit," 37 C.F.R. § 382.7(f), Defendants finalized their report to SoundExchange without correcting—or even acknowledging—the inaccuracies that Sirius XM had identified.

52.     Defendants' breach of Contract inflicted harm on Sirius XM in the form of legal fees and labor costs expended to respond to Defendants' sham "audit."

53.     Additionally, SoundExchange has demanded money from Sirius XM and commenced litigation against Sirius XM based on Defendants' faulty "royalty inspection."  Sirius

13

XM has already been and will be forced to expend millions of dollars defending itself in this baseless litigation.

## COUNT II: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

54.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

55.     Defendants entered into a binding Contract with Sirius XM in which they represented that they would act as a Qualified Auditor in rendering an independent audit in accordance with CRB regulations.

56.     Nonetheless, on information and belief, Defendants had already promised SoundExchange they would instead perform a "consulting service"—a one-sided royalty inspection designed to manufacture (and maximize) alleged underpayments by Sirius XM.

57.     Defendants purposefully and knowingly concealed impairments to their independence, their lack of objectivity, and their inability to act as a Qualified Auditor.  As a result, they thwarted Sirius XM's ability to receive an accurate and truthful verification of their 2018 royalty payments to SoundExchange.

58.     Defendants' breach of the implied covenant of good faith and fair dealing inflicted harm on Sirius XM in the form of legal fees and labor costs expended to respond to Defendants' sham "audit."

59.     Additionally, SoundExchange has demanded money from Sirius XM and commenced litigation against Sirius XM based on Defendants' faulty "royalty inspection."  Sirius XM has been and will be forced to expend millions of dollars defending itself in this baseless litigation.

14

## COUNT III: NEGLIGENCE

60.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

61.     Defendants were selected by SoundExchange to perform an independent audit of Sirius XM's 2018 royalty payments pursuant to 37 C.F.R. § 382.7.

62.     To be a "Qualified Auditor" under the CRB regulations, Defendants were required to be a "Certified Public Accountant independent within the meaning of the [AICPA] Code of Professional Conduct." *Id*. § 382.1.

63.     Defendants are members in public practice and are subject to the AICPA Code of Professional Conduct, including its requirements for independence and objectivity.

64.     The AICPA Code of Professional Conduct, in turn, requires both "independence of mind" and "independence in appearance." *See* AICPA, Code of Professional Conduct, §§ 0.400.23, 0.400.01, 1.200.001.01; *see also id.* §§ 1.100.001.01; 0.300.050.01.

65.     Under the CRB regulations, Defendants were required to "produce a written report to" SoundExchange.  37 C.F.R. § 382.7(f).

66.     Defendants knew that their audit report would be used for the specific purpose of verifying Sirius XM's 2018 royalty payments under the regulatory scheme set forth under the Copyright Act. *Id.* § 382.7(g)

67.     Defendants were at all times aware of what the regulations and the AICPA Code of Professional Conduct required, and that SoundExchange was relying on Defendants to adhere to those requirements in order to demand money from Sirius XM.

68.     Yet, in breach of the CRB regulations and Defendants' independent professional duty to remain independent, unbiased, and fair, they conducted a faulty and biased "royalty inspection" that fell well short of a true audit.

69.     Defendants' lack of independence was apparent at every step of their "royalty inspection." Defendants knew that, at the very least, they had compromised their ability to act as an unbiased and Qualified Auditor under the regulations, and at worst that their report was a prejudiced and incorrect evaluation of Sirius XM's finances.

70.     Defendants nevertheless provided their flawed report to SoundExchange for SoundExchange to rely upon in demanding the incorrectly identified underpayments from Sirius XM.

71.     As a result of Defendants' breach of their duty to conduct the audit in accordance with the regulations and their professional standards, Sirius XM has been harmed. Sirius XM was forced to expend extensive legal fees and labor costs responding to the false "auditing" process. Additionally, SoundExchange has demanded money from Sirius XM and commenced litigation against Sirius XM explicitly based in part on the compromised Adeptus report. Sirius XM has already incurred substantial funds defending itself against this unjust litigation, which is predicated on the tainted work of Adeptus and Stark.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Sirius XM prays that this Court enter judgment in its favor on all claims and grant the following relief:

a.      For compensatory, consequential, and punitive damages to which Sirius XM is entitled in an amount to be determined through discovery and trial;

b.      For an award to Sirius XM of pre-judgment and post-judgment interest, costs, and fees; and

c.      Any other relief the Court deems just and proper.

16

Dated: August 12, 2024

New York, New York

WEIL, GOTSHAL & MANGES LLP

By:  /s/ Todd Larson
_____
Todd Larson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8238
Facsimile: (212) 310-8007
Todd.Larson@weil.com

Andrew S. Tulumello*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
Drew.Tulumello@weil.com

*Pro hac vice motion forthcoming

Counsel for Sirius XM Radio Inc.

17

Case 1:24-cv-06553-LAK Document 1-1 Filed 09/06/24 Page 21 of 30

# Exhibit A

**Nondisclosure Agreement**

This Agreement (the "Agreement") is by and among SoundExchange Inc. ("SoundExchange"), 733 10th Street, NW, 10th Floor, Washington, DC 20001; Prager Metis CPAs, LLC ("PM"),14 Penn Plaza, Suite 1800, New York, NY 10122; and Sirius XM Radio Inc. ("Sirius XM"), 1290 Avenue of the Americas, 11th Floor, New York, NY 10104.

WHEREAS, SoundExchange has notified Sirius XM that it intends to have an independent audit of the payments and distributions of Sirius XM conducted pursuant to the provisions set forth in 37 C.F.R. § 382.7, and has designated PM as the Qualified Auditor in accordance with 37 C.F.R. § 382.1 to conduct such independent audit of the payments and distributions of Sirius XM (the "Project");

WHEREAS, SoundExchange desires that PM, in its capacity as the Qualified Auditor in accordance with 37 C.F.R. § 382.1, receive certain confidential, proprietary information of Sirius XM solely in connection with PM performing such independent audit of the payments and distributions of Sirius XM;

WHEREAS, Sirius XM desires to protect certain confidential, proprietary information disclosed to PM during the course of the independent audit from disclosure by SoundExchange to its members;

NOW, THEREFORE, it is agreed as follows:

1. The "Confidential Information" means information of whatever nature, including information in oral, written, electronic or other formats, which is provided by Sirius XM to PM. Notwithstanding anything to the contrary in this Agreement, Confidential Information shall not include information that:

   (a) is or becomes publicly available other than by a breach of this Agreement by PM or SoundExchange; or

   (b) is acquired by PM or SoundExchange from a third party that is not, to the best of their respective knowledge after due inquiry, under any confidentiality obligation to Sirius XM regarding such information; or

   (c) is known to PM or SoundExchange prior to the date of this Agreement, or that is developed by PM or SoundExchange independently without use of the Confidential Information. PM or SoundExchange, as applicable, shall bear the burden of proving that such information was known prior to the date of this Agreement or was independently developed by PM or SoundExchange.

Designating or otherwise treating information as Confidential Information under this Agreement does not mean that such information either is or is not "Confidential Information" as defined under any law.

**Confidentiality As Between PM and Sirius XM**

2. PM agrees to keep confidential the Confidential Information of Sirius XM, and shall disclose the Confidential Information only to its employees and/or personnel who have a need to know such information. PM will be responsible for any breach of this Agreement by its employees or personnel.

3. Notwithstanding anything to the contrary in this Agreement, PM may disclose Confidential Information if required by applicable law or regulation, including any subpoena or other similar form of process. PM may also provide information to SoundExchange solely to the extent permitted by the terms of 37 C.F.R. § 382.7. PM will provide Sirius XM with prompt written notice of any request that PM disclose Confidential Information to any other person so that Sirius XM may object to the request and/or seek an appropriate protective order.



4. Upon Sirius XM's written request, PM shall return to Sirius XM all Confidential Information, or at Sirius XM's option, represent in writing to Sirius XM that all such Confidential Information (including all copies thereof) has been destroyed. However, PM may keep an archival set of its working papers together with such copies of Sirius XM's Confidential Information necessary to comply with applicable laws, regulations and professional standards with respect to the documentation of work performed.

5. PM recognizes the confidential and proprietary nature of Sirius XM's Confidential Information and acknowledges that in the event of a breach of the confidentiality provisions of this Agreement Sirius XM may suffer irreparable harm. Accordingly, Sirius XM shall be entitled to seek injunctive relief in the event of a breach or threatened breach of this Agreement, as well as all other applicable remedies at law or in equity.

6. PM agrees that the audit will adhere to 37 C.F.R. § 382.7.

7. PM represents and warrants to Sirius XM that it is a "Qualified Auditor" within the meaning of 37 C.F.R. § 382.1 and will at all times during the performance of the Project remain a "Qualified Auditor" within the meaning of 37 C.F.R. § 382.1.

**Confidentiality As Between SoundExchange and Sirius XM**

8. SoundExchange agrees to keep confidential the Confidential Information of Sirius XM, and shall disclose the Confidential Information only to its employees and/or personnel who are engaged in the collection and distribution of royalty payments and activities related thereto and who are not also currently an employee or officer of a sound recording copyright owner or performing artist. SoundExchange will be responsible for any breach of this Agreement by its employees or personnel. SoundExchange may disclose any findings or reports prepared or communicated by PM, so long as such findings or reports do not contain Confidential Information, to any persons entitled to receive such material under 37 C.F.R. § 382.6. To the extent that SoundExchange has received Confidential Information from PM in accordance with paragraph 3, SoundExchange may disclose that information to persons entitled to such material under 37 C.F.R. § 382.6.

9. SoundExchange shall not disclose Confidential Information except as permitted by paragraph 8.

10. Upon Sirius XM's written request, SoundExchange shall return to Sirius XM all Confidential Information, or at Sirius XM's option, represent in writing to Sirius XM that all such Confidential Information (including all copies thereof) has been destroyed. Notwithstanding this provision, SoundExchange will not be required to return or destroy any findings, reports or summaries prepared for it by PM.

11. SoundExchange recognizes the confidential and proprietary nature of Sirius XM's Confidential Information and acknowledges that in the event of a breach of the confidentiality provisions of this Agreement Sirius XM may suffer irreparable harm. Accordingly, Sirius XM shall be entitled to seek injunctive relief in the event of a breach or threatened breach of this Agreement, as well as all other applicable remedies at law or in equity.

**Miscellaneous**

12. All notices, approvals, requests, authorizations, directions or other communications under this Agreement required or permitted to be given under this Agreement by a party will be in writing, addressed to the other parties as set forth below (or to such other address as a party may have been notified pursuant to a notice given under this Section), and will be deemed to have been duly given if and when: (a) delivered personally to the required addressee named below; (b) mailed by first class



Case 1:24-cv-06553-UA Document 1-1 Filed 09/18/24 Page 24 of 30

certified mail, return receipt requested, postage prepaid (with a copy by email which, by itself, will not constitute notice); or (c) sent by a nationally recognized express courier service, postage or delivery charges prepaid and with written verification of receipt. Any notices not addressed as specified will be deemed to not have been given or received.

If to PM:

> Prager Metis CPAs, LLC
> 14 Penn Plaza, 18th Floor
> New York, NY 10122
> Attn: General Counsel

If to SoundExchange:

> SoundExchange, Inc.
> 733 10th Street NW, 10th Floor
> Washington, DC 20001
> Attn: General Counsel

If to Sirius XM:

> Sirius XM Radio Inc.
> 1290 Avenue of the Americas, 11th Floor
> New York, NY 10104
> Attn: Controller

with a copy to:

> Sirius XM Radio Inc.
> 1290 Avenue of the Americas, 11th Floor
> New York, NY 10104
> Attn: General Counsel

13. This Agreement shall be governed and construed pursuant to the laws of the State of New York without giving effect to its conflict-of-laws principles.

14. This Agreement constitutes the sole agreement among the parties relating to the subject matter hereof, and terminates and supersedes any and all prior agreements, arrangements, and understandings between the parties as to such subject matter.

15. This Agreement may not be modified, altered, or amended except in a writing signed by the parties.



Case 1:24-cv-06553-LDA    Document 11    Filed 09/16/24    Page 25 of 30

INDEX NO. 654079/2024
RECEIVED NYSCEF: 08/12/2024

IN WITNESS WHEREOF, the parties have signed this agreement as of February 10, 2020.

By: _____

**Patrick L. Donnelly**
Executive Vice President, General
Counsel and Secretary
Sirius XM Radio Inc.

By: _____

**Lewis Stark**
Prager Metis CPAs, LLC

By: _____

**C. Colin Rushing**
Senior Vice President and General Counsel
SoundExchange, Inc.

Case 1:24-cv-06553-LJA Document 1-1 Filed 09/16/24 Page 26 of 30

**Exhibit B**

**Nondisclosure Agreement**

This Agreement (the "Agreement") is by and among SoundExchange Inc. ("SoundExchange"), 733 10th Street, NW., 10th Floor, Washington, DC 20001; Adeptus Partners, LLC ("AP"),244 W. 54th Street, 9th Floor, New York, NY 10019; and Sirius XM Radio Inc. ("Sirius XM"), 1290 Avenue of the Americas, 11th Floor,  New York, NY 10019.

WHEREAS, SoundExchange has notified Sirius XM that intends to have conducted an independent audit of the payments and distributions of Sirius XM  pursuant to the provisions set forth in 37 C.F.R. § 382.7, and has designated AP as the Qualified Auditor in accordance with 37 C.F.R.  § 382.1 to conduct such independent audit of the payments and distributions of Sirius XM (the "Project");

WHEREAS, SoundExchange desires that AP, in its capacity as the Qualified Auditor in accordance with 37 C.F.R. § 382.1, receive certain confidential, proprietary information of Sirius XM solely in connection with AP performing such independent audit of the payments and distributions of Sirius XM;

WHEREAS, Sirius XM desires to protect certain confidential, proprietary information disclosed to AP during the course of the independent audit from disclosure by SoundExchange to its members;

NOW, THEREFORE, it is agreed as follows:

1.  The "Confidential Information" means information of whatever nature, including information in oral, written, electronic or other formats, which is provided by Sirius XM to AP.  Notwithstanding anything to the contrary in this Agreement, Confidential Information shall not include information that:

    (a) is or becomes publicly available other than by a breach of this Agreement by AP or SoundExchange; or

    (b) is acquired by AP or SoundExchange from a third party that is not, to the best of their respective knowledge after due inquiry, under any confidentiality obligation to Sirius XM regarding such information; or

    (c) is known to AP or SoundExchange prior to the date of this Agreement, or that is developed by AP or SoundExchange independently without use of the Confidential Information.  AP or SoundExchange, as applicable, shall bear the burden of proving that such information was known prior to the date of this Agreement or was independently developed by AP or SoundExchange.

Designating or otherwise treating information as Confidential Information under this Agreement does not mean that such information either is or is not "Confidential Information" as defined under any law.

**Confidentiality As Between AP and Sirius XM**

2.  AP agrees to keep confidential the Confidential Information of Sirius XM, and shall disclose the Confidential Information only to its employees and/or personnel who have a need to know such information.  AP will be responsible for any breach of this Agreement by its employees or personnel.

3.  Notwithstanding anything to the contrary in this Agreement, AP may disclose Confidential Information if required by applicable law or regulation, including any subpoena or other similar form of process.  AP may also provide information to SoundExchange solely to the extent permitted by the terms of 37 C.F.R. § 382.7.  AP will provide Sirius XM with prompt written notice of any request that AP disclose Confidential Information to any other person so that Sirius XM may object to the request and/or seek an appropriate protective order.

4. Upon Sirius XM's written request, AP shall return to Sirius XM all Confidential Information, or at Sirius XM's option, represent in writing to Sirius XM that all such Confidential Information (including all copies thereof) has been destroyed. However, AP may keep an archival set of its working papers together with such copies of Sirius XM's Confidential Information necessary to comply with applicable laws, regulations and professional standards with respect to the documentation of work performed.

5. AP recognizes the confidential and proprietary nature of Sirius XM's Confidential Information and acknowledges that in the event of a breach of the confidentiality provisions of this Agreement Sirius XM may suffer irreparable harm. Accordingly, Sirius XM shall be entitled to seek injunctive relief in the event of a breach or threatened breach of this Agreement, as well as all other applicable remedies at law or in equity.

6. AP agrees that the audit will adhere to 37 C.F.R. §382.7.

7. AP represents and warrants to Sirius XM that it is a "Qualified Auditor" within the meaning of 37 C.F.R. § 382.1, and will at all times during the performance of the Project remain a "Qualified Auditor" within the meaning of 37 C.F.R. § 382.1.

**Confidentiality As Between SoundExchange and Sirius XM**

8. SoundExchange agrees to keep confidential the Confidential Information of Sirius XM, and shall disclose the Confidential Information only to its employees and/or personnel who are engaged in the collection and distribution of royalty payments and activities related thereto and who are not also currently an employee or officer of a sound recording copyright owner or performing artist. SoundExchange will be responsible for any breach of this Agreement by its employees or personnel. SoundExchange may disclose any findings or reports prepared or communicated by AP, so long as such findings or reports do not contain Confidential Information, to any persons entitled to received such material under 37 C.F.R. § 382.6. However, to the extent that SoundExchange has received Confidential Information from AP in accordance with paragraph 3, SoundExchange may disclose that information to persons entitled to such material under 37 C.F.R. § 382.6.

9. SoundExchange shall not disclose Confidential Information except as permitted by paragraph 8.

10. Upon Sirius XM's written request, SoundExchange shall return to Sirius XM all Confidential Information, or at Sirius XM's option, represent in writing to Sirius XM that all such Confidential Information (including all copies thereof) has been destroyed. Notwithstanding this provision, SoundExchange will not be required to return or destroy any findings, reports or summaries prepared for it by AP.

11. SoundExchange recognizes the confidential and proprietary nature of Sirius XM's Confidential Information and acknowledges that in the event of a breach of the confidentiality provisions of this Agreement Sirius XM may suffer irreparable harm. Accordingly, Sirius XM shall be entitled to seek injunctive relief in the event of a breach or threatened breach of this Agreement, as well as all other applicable remedies at law or in equity.

**Miscellaneous**

12. All notices, approvals, requests, authorizations, directions or other communications under this Agreement required or permitted to be given under this Agreement by a party will be in writing, addressed to the other parties as set forth below (or to such other address as a party may have been notified pursuant to a notice given under this Section), and will be deemed to have been duly given if and when: (a) delivered personally to the required addressee named below; (b) mailed by first class



certified mail, return receipt requested, postage prepaid (with a copy by email which, by itself, will not constitute notice); or (c) sent by a nationally recognized express courier service, postage or delivery charges prepaid and with written verification of receipt.  Any notices not addressed as specified will be deemed to not have been given or received.

If to AP:

Adeptus Partner, LLC
244 West 54th Street, 9th Floor
New York, NY 10019
Attn: Lewis Stark

If to SoundExchange:

SoundExchange, Inc.
733 10th Street NW, 10th Floor
Washington, D.C. 20001

If to Sirius XM:

Sirius XM Radio Inc.
1221 ~~1290~~ Avenue of the Americas, 35th Floor
New York, NY ~~10104~~ 10020
Attn: Controller

with a copy to:

Sirius XM Radio Inc.
1221 ~~1290~~ Avenue of the Americas, 35th Floor
New York, NY ~~10104~~ 10020
Attn: General Counsel

13. This Agreement shall be governed and construed pursuant to the laws of the State of New York without giving effect to its conflict-of-laws principles.

14. This Agreement constitutes the sole agreement among the parties relating to the subject matter hereof, and terminates and supersedes any and all prior agreements, arrangements, and understandings between the parties as to such subject matter.

15. This Agreement may not be modified, altered, or amended except in a writing signed by the parties.

IN WITNESS WHEREOF, the parties have signed this agreement as of November 23, 2021.

By: _____

**Patrick L. Donnelly**
Executive Vice President, General
Counsel and Secretary
Sirius XM Radio Inc.

By: _____

**Lewis Stark**
Adeptus Partners, LLC

By: _____

**C. Colin Rushing**
Chief Legal Officer
SoundExchange, Inc.